## NEAL *vs.* TODD & KILLEBREED.

The acts of 1764 (Cobb, 725,) and 1765, (Cobb, 727,) against gaming, constitutional and valid, and of force in this State.

Debt, for money won at cards, in Glasscock Superior Court. Decision by Judge THOMAS, February Term, 1859.

This was an action of debt brought by William M. Neal against William Todd and Jeremiah Killebreed, to recover money won at cards by defendants of John P. Bagget and Robert L. Niblet, under the provision, and by virtue of the act of 25th March, 1765, and the several acts passed before that time.

The defendants demurred to the declaration, on the ground that the acts referred to and under which the action is brought are not of force in this State, and that no suit can be maintained thereon. The court sustained the demurrer and dismissed the action, and plaintiff excepted.

Neal vs. Todd & Killebreed.

E. H. Pottle, for plaintiff in error.

Wasden & Nelms, *contra.*

*By the Court.*—Lumpkin, J., delivering the opinion.

This is a statutory action founded on the Provincial Acts of 1764-5; the former passed the 29th of March, 1764, and the latter the 25th of March, 1765, and the only question to be decided is, are these acts in force in this State?

The act of 1764 was to continue for the space of seven years, and from thence to the end of the next session of the General Assembly, (Watkins' Digest, 98.) The act of 1765 was to be in force for six years and to the end of the next session of the General Assembly, and no longer (Watkins' Digest, 113.) By act of September, 1773, (Watkins' Digest, 189,) these acts were further continued for one year and to the end of the next session of the General Assembly. *When* the next General Assembly met, after September, 1774, the early compilers of our laws and the historians of our State are at variance. Watkins says: The next General Assembly was held in 1777. If that be so, of course the statutes were in force in May, 1776, and were embraced in the adopting statute of 1784 (Watkins' Digest, 289.) McCall and White both assert that the General Assembly met in January, 1775. (2, McCall's History of Georgia, p. 31; and White's Historical Collections, 50.) The difficulty attending that period make all statements doubtful and uncertain as to what did or did not transpire from the year 1773 up to 1777. But, in our judgment, the question under consideration does not depend upon the settlement of the point in dispute.

These acts were revived by the act of 1777; (Watkins' Digest, 202,) again in 1778, (Watkins' Digest, 231,) and beyond all controversy in 1781, (Watkins' Digest,

239.)   For that act revives and declares to be in force "the several laws theretofore made in the then province of Georgia—and also all laws made and passed by the several conventions, congresses and houses of assembly of the State of Georgia (and not repealed by that or any former house,) except those which are repugnant to the constitution." These acts were never *repealed*; they were not repugnant to the constitution of February, 1777. Again the act of 1783 declared all laws adopted prior to 1778, designed to suppress one of the monster evils of the world, to be in full force and so continue until repealed—which were not repugnant to the constitution, or *in their nature temporary.* (Watkins' Digest, 281.) Can the acts of 1764–5 be said to be temporary in their nature? Surely not. These or similar acts have always existed in this and the other States of the Union, as well as in great Britain. They are peculiar to no age or country.

Our conclusion then is, that the validity of these statutes does not depend upon the adopting act of 1784, though we are quite confident they will be found covered by that act when the records of the past are searched up and the whole truth ascertained. In other words, we believe they were in force in May, 1776, and had been for ten years before that time. But we hold that the onus is changed; and that those who wish to get rid of them must show their *repeal* since 1783. They are certainly, if not adopted, not repealed by the adopting act of 1784.

But it is insisted that the acts of 1778, 1781, 1783 and 1784 are all unconstitutional in this, that they adopt previous statutes *en masse*, contrary to the VIIIth section of the constitution of 1777. (Watkins' Digest, 9.) If this court has failed to establish the negative of this proposition in the case of the Bibb County Loan Association vs. Richards, (21, Ga. Rep., 592,) to which no allusion was made in the argument, then for myself I despair of doing

Neal vs. Todd & Killebreed.

so, and here I leave the subject. The lives, liberties and property of the people of Georgia have been protected, and controlled by the general adopting statute of 1784 for seventy-five years, and now a grave discussion is had as to its constitutionality!

Again, it is urged with earnestness that the acts of 1764–5 are penal in their character, contrary to the genius of our government and the constitutions of tne United States and our State; are obsolete and necessarily repealed by the Penal Code of 1833. If these assumptions be well founded, the men of the revolution, who passed those acts, were greatly wanting either in patriotism or perspicuity; and their descendants are no better. That a man who wins money or property from another should not be permitted to keep it, but that the law should enable the loser to recover it back; and if he refuses or neglects to do so, then any other person. We confess we see nothing in this in conflict either with the genius of our government or our Federal or our State Constitution. And if, after the sharper is thus compelled to disgorge his ill-gotten gains, he is made amenable on the criminal side of the court for the offence of which he has been guilty, how does this provision of our Penal Code and the evil remedy interfere with each other? A thief steals my horse or slave and is tried and convicted of larceny. Does that satisfy the ends of justice? No; but I am entitled to my property or its equivalent.

Finally, it is contended that there are and can be no competent parties to the action. That there is no such organization as the "Poor of the Parish," for whose use one-half of the recovery is to be appropriated. That the "Poor of the Parish" are not susceptible of ascertainment; and that this difficulty cannot be obviated by the doctrine of *Cypres*, nor by the statute of Elizabeth, nor by the inherent powers of a court of Chancery.

The law provides that the *whole amount* of the money

lost shall be recovered by the plaintiff in an action of debt. Here then is his warrant for recovering the *whole;* what is to become of it afterwards is not a question for the public. He cannot hold it, and if the law, as it now stands, is so deficient that one moiety can be applied, there being no other owner, it goes to the State, and she may declare what disposition shall be made of the fund.

I want simply to say, in conclusion, that the act of 1764, (Watkins' Digest, 100; Prince, 221,) as to the duty of executors and administrators, courts of ordinary, guardians, &c., stands precisely upon the same footing as the statutes we have been examining. This act was to continue in force for the space of seven years and from thence to the end of the next session of the General Assembly and no longer. Was further continued by the act of 1773; and if the statutes against gaming expired before 1777, and were not revived by the subsequent acts of 1778, 1781, 1783 and 1784, then this foundation act as to the law of executors and administrators, guardians, courts of ordinary, &c., is obsolete and void; and if these adopting acts are unconstitutional as to them, they are equally so as to it. Watkins, who compiled our first Digest, in 1800, took a prominent part in the councils of the State in 1796. He had attained to mature manhood at that time, and must have been cotemporary with the legislation which we have been reviewing. Marbury and Crawford compiled their digest in 1802. The opinions of these men are certainly worth something. The republication of these acts in every Digest since, by authority of the law-making power and the universal acquiesence in them, for sixty years, by the people and the profession, should, in my humble opinion, have rendered this investigation unnecessary. There have been giants in Georgia, both at the bar and in the counsels of State, and it

behooves us, if we would be respected by our posterity, to manifest a becoming reverence for the teachings of our fathers.

Judgment reversed.